UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DEBORAH J. MORGAN,

                          Plaintiff,

        -against-                                              6:14-cv-0549 (LEK)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                          Defendant.

_____

## DECISION and ORDER

### I.    INTRODUCTION

        This case has proceeded in accordance with General Order 18, which sets forth the

procedures to be followed in appealing a denial of Social Security benefits.  Both parties have filed

briefs.  Dkt. Nos. 11 ("Plaintiff's Brief"); 13 ("Defendant's Brief").  For the following reasons, the

judgment of the Social Security Administration ("SSA") is affirmed.

### II.   BACKGROUND

        On October 27, 2011, Plaintiff Deborah J. Morgan ("Plaintiff") filed an application for

disability insurance and Supplemental Security Income ("SSI") benefits, alleging disability with an

onset date of November 1, 2007.  Dkt. No. 7 ("Record") at 228.[1]  The application was denied on

February 13, 2012.  R. at 125.  On February 16, 2012, Plaintiff filed a request for a hearing with an

administrative law judge ("ALJ").  R. at 131.  On December 11, 2012, Plaintiff appeared with

counsel for an in-person hearing before ALJ Gregory Hamel ("Hamel"), who presided over the

hearing in Utica, New York.  R. at 80.

_____

        [1] Citations to the Record use the pagination assigned by the SSA.

**A.  Plaintiff's Medical Records and History**

Plaintiff was born on June 12, 1963.  R. at 51.  Plaintiff has a high school diploma and one year of college education.  R. at 86.  She has no past relevant work history; the last job she had was as a retail sales clerk over fifteen years ago.  R. at 50.  Plaintiff alleges that her impairment of severe depression began November 1, 2007.  R. at 228.  She alleges the onset of her depression was caused by her son's adverse reaction to a vaccine, which caused him to be wheelchair bound for four months.  R. at 311.  In November 2007, Plaintiff's primary care physician, Dr. Frederick, diagnosed her with depression.  R. at 433.  Plaintiff alleges that additional stresses to her and her family aggravated her depression.  Pl.'s Br. at 4.  Plaintiff's husband, Bill, is physically disabled and has had several health problems, including a stroke in February 2008, and has undergone several surgeries, including back surgery in 2009.  Id.  In November 2009, Plaintiff's house caught fire, causing her to lose many of her belongings and causing her to live in her mother's house for eight months.  Id.  Plaintiff claims that tense interactions with her mother added to the stress of rebuilding her home, and it was during this time that Plaintiff began counseling.  Id.  In July 2010, Plaintiff moved out of her mother's house and into a camper, and then in November 2010, Plaintiff and her family were able to move back into their unfinished home.  Id.  Plaintiff continued to seek treatment and counseling to cope with her depression.  Id.

*1.  James Frederick, M.D.*

Plaintiff first saw Dr. Frederick for her depression on November 15, 2007.  Id.  Dr. Frederick noted that Plaintiff was "tearful, quiet" and had a "depressed affect."  R. at 435.  He explained the causes of depression to Plaintiff and prescribed her Effexor.  Id.  Plaintiff had a follow-up appointment with Dr. Frederick on January 3, 2008, where he noted that Plaintiff felt "better but not

back to normal." R. at 426. He also noted that Plaintiff cried less and had more energy, but that she felt like she was "not coping as well [she] used to." Id.

On March 13, 2008, at Plaintiff's next visit to Dr. Frederick, she claimed that her depression was "lousy" and that she was dealing with the death of her dog, her husband's hospital admission, and her son's "mono-like" symptoms. R. at 423. Dr. Frederick assessed her depression as deteriorated and increased her medication dosage.[2] R. at 424. On her next visit, on April 24, 2008, Dr. Frederick assessed Plaintiff's depression as unchanged, and noted that Plaintiff claimed her depression was "not as bad as it has been in [the] past" but that she did not feel back to normal and that she was "still irritable over annoying things." R. at 421-22.

Plaintiff saw Dr. Frederick next on May 22, 2008, where she reported that she had little energy and little ambition, slept poorly and napped a lot, and had "no emotional highs or lows but also no laughing or enjoyment." R. at 418. Dr. Frederick again assessed her depression as unchanged. R. at 419. Dr. Frederick reported that Plaintiff was alert and cooperative, had a normal mood and affect, and had a normal attention span and concentration. Id. Dr. Frederick noted that Plaintiff reported some positive alarm features for depression including "insomnia, hypersomnia, psychomotor retardation, and fatigue." R. at 418. However, he explained that Plaintiff denied significant weight loss or gain, psychomotor agitation, feelings of worthlessness, impaired concentration, and recurrent thoughts of death or suicide. Id. Dr. Frederick added a prescription of Wellbutrin to Plaintiff's list of medication. Id.

On July 21, 2008, at Plaintiff's next visit with Dr. Frederick, he changed her medication

---

[2] Plaintiff was seen by a nurse practitioner in Dr. Frederick's office in December 2007 for a routine physical, where her medication was changed from Effexor to Lexapro. Pl.'s Br. at 5.

from Wellbutrin to Cymbalta after Plaintiff reported an adverse side affect to Wellbutrin. R. at 415. During this visit, Plaintiff claimed that she "doesn't want to do anything" and that it was a "chore" to get out of bed. Id. She also claimed to be irritable and to cry easily. Id. Dr. Frederick again assessed Plaintiff's depression as unchanged. R. at 416. Plaintiff next saw Dr. Frederick on August 18, 2008, where she admitted that she thought she was "getting a little better" and felt less tired, less irritable, more stable, and had more energy. R. at 412.

Plaintiff's next appointment with Dr. Frederick was on September 29, 2008, during which he noted that Plaintiff claimed to sleep poorly, but that her depression was "not getting worse." R. at 408. Dr. Frederick noted that Plaintiff "has been stable despite increased stresses," and he assessed her depression as unchanged. R. at 408-09.

On December 15, 2008, and January 15, 2009, Plaintiff saw Dr. Frederick for hospital discharge follow-up appointments, following a hospitalization for cytomegaloviral disease in fall 2008. Pl.'s Br. at 6. She reported having no energy and no endurance during these visits. R. at 401, 405. On March 2, 2009, Plaintiff saw Dr. Frederick and complained that she slept a lot and felt weak, and that she had felt fatigued since she had been hospitalized for cytomegalovirus. R. at 394. Dr. Frederick noted that Plaintiff's depression was worse, and that she was frustrated by her slow recovery from cytomegalovirus. Id. He posited that Plaintiff's fatigue was "multi-factorial, but mostly due to her cytomegalovirus infection." R. at 396.

Plaintiff saw Dr. Frederick on June 1, 2009, for a routine follow-up. R. at 383. Dr. Frederick noted that Plaintiff complained of fatigue and that she did not feel alert, and also that she asked about her depression. Id. During this visit, Dr. Frederick assessed Plaintiff's depression as improved. R. at 385. On July 6, 2009, during another follow-up exam for Plaintiff's fatigue, Dr.

4

Frederick noted that Plaintiff felt slightly more alert, but that she still felt unsafe to drive. R. at 380. Additionally, he documented that Plaintiff was still having trouble sleeping. Id. Dr. Frederick again saw Plaintiff on September 14, 2009, for a routine follow-up and medication review. R. at 377. During this visit, Plaintiff claimed that it was hard for her to fall asleep due to her mind racing and reported that her father died on August 25. Id. Dr. Frederick assessed her depression as unchanged and did not change her medication. R. at 379.

Plaintiff next met with Dr. Frederick on December 21, 2009. R. at 374. Plaintiff explained that her house had caught fire, which forced her to live with her mother, and that her husband had had "major surgery." Id. Dr. Frederick noted that during this visit she had "poor concentration" and was "tearful," and he assessed her depression as deteriorated. R. at 374-75. It was during this visit that Dr. Frederick suggested that Plaintiff see a counselor for the first time. R. at 376. On January 28, 2010, during a routine follow-up, Dr. Frederick assessed Plaintiff's depression as improved and recommended that Plaintiff continue to see the counselor that she had begun to see. R. at 373.

On March 11, 2010, at Plaintiff's next appointment with Dr. Frederick, he noted that she was still experiencing stress from her living situation, but that this was "less or possibly stable." R. at 368. Dr. Frederick assessed her depression as deteriorated and increased Plaintiff's Cymbalta dosage. R. at 369-70. On June 17, 2010, during a routine follow-up visit, Plaintiff questioned whether her depression medication was working and explained that she continued to have significant stress at home. R. at 366. Dr. Frederick prescribed Plaintiff Pristiq to try as a new medication to treat her depression. R. at 367.

Plaintiff saw Dr. Frederick on July 26, 2010, for another routine follow-up, where she complained about being overwhelmed by the work of rebuilding her home and that her relationship

with her mother had worsened.  R. at 364.  Dr. Frederick noted that Plaintiff's "husband says that

overall she is significantly better and has fewer low days."  Id.  During Plaintiff's next visit, on

September 27, 2010, she complained that her depression was worse, but Dr. Frederick assessed it as

unchanged.  R. at 361-62.  At Plaintiff's next visit on November 15, 2010, she reported that she had

moved back into her home, and Dr. Frederick assessed her depression as improved, but noted that

she "still over-reacts to everyday ups and downs."  R. at 358, 360.

Plaintiff's next appointment with Dr. Frederick was on January 3, 2011, and was primarily

for her gastroesophgeal reflux disease.  R. at 355.  During this visit, Plaintiff complained of

shoulder pain and that she had a burning throat in the morning, and reported that she "made it

through" several things.  Id.  Dr. Frederick assessed her depression as improved.  R. at 357.  At her

next appointment, on May 9, 2011, Dr. Frederick noted that while Plaintiff had some "dark days,"

she was "better with nicer weather."  R. at 352.  Dr. Frederick again assessed her depression as

improved.  R. at 354.  Her next appointment with Dr. Frederick was on September 12, 2011.  R. at

341.  During this visit, Plaintiff stated her "depression is finally starting to stabilize" but she felt that

her "memory is shot."  Id.  At her next visit, November 7, 2011, Plaintiff claimed that she felt her

"depression [is] not doing as well as I thought it was."  R. at 337.  At Plaintiff's February 13, 2012

visit to Dr. Frederick, Dr. Frederick reported that Plaintiff was coping with her ups and downs.  R.

at 564.

On Plaintiff's March 26, 2012 visit to Dr. Frederick, he noted that her depression had not

improved and that she still continued to sleep excessively.  R. at 559.  He assessed her depression as

unchanged.  R. at 561.  On June 18, 2012, Dr. Frederick reported that Plaintiff's depression gets

better on sunny days and worse on rainy days.  R. at 543.  He also reported that Plaintiff gets

hypervigilant and panics when she sees her mother.  Id.

Plaintiff had an appointment on October 1, 2012, where she claimed, "[I] know [I] am doing better with the medication increase."  R. at 576.  Dr. Frederick reported that Plaintiff's stressors tend to "throw her off for prolonged periods."  Id.  On Plaintiff's January 7, 2013 appointment with Dr. Frederick, he noted that she was dealing with the death of her step-daughter and that her depression had worsened.  R. at 21.

Dr. Frederick provided a medical source statement on November 23, 2012.  R. at 579-80.  In this statement, Dr. Frederick claimed that Plaintiff had "extreme"[3] limitations in her ability to make simple decisions, manage stress appropriately, and maintain socially appropriate behavior without exhibiting behavior extremes, as well as with her ability to function in a work setting at a consistent pace.  R. at 579.  He also opined that Plaintiff had "marked"[4] limitations in her ability to understand and remember instructions, and "moderate"[5] limitations in her ability to maintain attention/concentration, to interact with others, and to maintain basic standards of personal hygiene and grooming.  Id.  Dr. Frederick claimed that Plaintiff had "none/mild"[6] limitations in her ability to carry out instructions and her ability to manage her own schedule/demonstrate reliability.  Id.

---

[3] An "extreme" limitation represents a degree of limitation that is incompatible with the ability to do gainful activity.  R. at 579.

[4] A "marked" limitation is one that "interferes seriously with your ability to function independently, appropriately, effectively, and on a sustained basis.  Limitations are present for at least two thirds of the time in an 8-hour workday."  R. at 579.

[5] A "moderate" limitation means that "there are some limitations, but overall the individual functions adequately.  Limitations are present for at least one third of the time in an 8-hour workday."  R. at 579.

[6] "None/mild" limitations means that there "are no significant problems in this area."  R. at 579.

*2. Counseling Sessions with Ms. Barbara Rice and Ms. Elizabeth Davis*

Dr. Frederick, Plaintiff's primary care physician, suggested that Plaintiff see a counselor at their December 21, 2009 appointment. R. at 376. Plaintiff began counseling with Ms. Barbara Rice on January 12, 2010. R. at 462. Plaintiff met with Ms. Rice a total of twenty times from January 2010 to December 2010, when Ms. Rice retired. Id. Ms. Rice diagnosed Plaintiff with major depressive disorder and generalized anxiety disorder. Id. She noted that Plaintiff was tearful and felt "overwhelmed" on her visits. Id. During their sessions, Ms. Rice reported that she taught Plaintiff coping skills to help her fight the "panic" caused by the stressors that Plaintiff's family endured, including her son's adverse reaction to a vaccine, her husband's health problems, and the fire in Plaintiff's home. Id. Ms. Rice explained that it was the stress of the fire and living in her mother's home that caused Plaintiff to begin to see Ms. Rice. Id. At the time of their last meeting, Ms. Rice noted that Plaintiff was able to "accomplish tasks to help with getting the home cleaned so that repairs could be started." Id. Ms. Rice opined that Plaintiff was "motivated to treatment" and because Plaintiff claimed that "she did not feel well enough to stop treatment," Ms. Rice referred her to another therapist. R. at 463.

Plaintiff began counseling with Ms. Elizabeth Davis on December 15, 2010. R. at 465. At their first meeting, Ms. Davis noted that Plaintiff seemed stable, and that Plaintiff wanted to be seen every two weeks. Id. At their next meeting, on December 29, 2010, Ms. Davis noted that "holidays are a trigger" for Plaintiff's depression, and that Plaintiff claimed to feel out of control of her life. Id. Ms. Davis recorded that Plaintiff denied thoughts of suicide. Id. At their next meeting, on January 12, 2011, Ms. Davis and Plaintiff continued to talk about the stress of cleaning and rebuilding the house, and again Plaintiff denied thoughts of suicide and stated that it was something

that she would never do.  Id.  At their meeting on February 9, 2011, Ms. Davis stated that Plaintiff's

depression gets worse in the winter due to the lack of sunlight.  Id.

In Plaintiff's two visits in March 2011, Ms. Davis noted that Plaintiff seemed hopeful that

she would get a lot done on the house during the spring and summer, and assessed Plaintiff's

depression as mild to moderate.  R. at 466.  During her two visits in April 2010, Ms. Davis noted

that Plaintiff's depression improved with the weather, and that Plaintiff was pleased that her son had

a girlfriend.  Id.  During Plaintiff's May 4, 2011 appointment, Ms. Davis stated that Plaintiff was

making progress in organizing her home, even though Plaintiff found it emotionally stressful to

organize things in her home because it reminds her of what she lost in the fire.  Id.

Ms. Davis noted throughout the summer, during Plaintiff's visits on June 1, June 22, July 6,

July 27, and August 9, 2011, things seemed to be going well with Plaintiff.  R. at 467.  Plaintiff

claimed that she continued to clean up from the fire, and that she enjoyed having her children home

for the summer.  Id.

On August 24, 2011, Ms. Davis explained that school shopping was stressful for Plaintiff

because money was tight, but noted that Plaintiff's depression was mild.  R. at 468.  At their

September 14, 2011 meeting, Ms. Davis explained that Plaintiff was affected by a decrease in

sunlight and that it was hard for Plaintiff to have her sons go back to school.  Id.  At their September

28, 2011 meeting, Ms. Davis reported that Plaintiff felt that if she went to the store alone, her

chances of having a panic attack increased.  Id.  On October 19, 2011, Ms. Davis noted that Plaintiff

seemed to have more a of purpose when she was taking care of her husband, and that her depression

was mild.  Id.

At their November 9, 2011 appointment, Ms. Davis explained that Plaintiff had a

"breakthrough" when she drove to the grocery store by herself. Id. Additionally, Ms. Davis noted that Plaintiff handled it "very well" when she ran into her sister and mother. Id. On November 23, 2011, they talked about planning for Thanksgiving and how Plaintiff used to love cooking but claimed that she gets no joy out of it anymore. R. at 469.

On December 13, 2011, while at their meeting, Plaintiff's husband started having heart problems and was taken to the hospital by ambulance. Id. Ms. Davis reported that Plaintiff handled it "okay" and that she drove herself to the hospital. Id. At their meeting on December 27, 2011, Ms. Davis documented that Plaintiff was coping well with her husband's health issues, but that she was still very worried about him. Id. On January 16, 2012, Ms. Davis noted that holidays are hard for Plaintiff, and that she remains depressed but is "managing to cope." Id.

At their meeting on February 15, 2012, Ms. Davis noted that "there are several positive things happening in [Plaintiff's] world now." R. at 470. At her next meeting, on February 29, 2012, Plaintiff told Ms. Davis that she was denied for disability, and that she was frustrated because she wants to get back to her previous level of functioning. Id. Ms. Davis explained to Plaintiff that her "depression came from events so she should be able to regain her level of functioning." Id.

At their meeting on March 20, 2012, Ms. Davis reported that Plaintiff was still at odds with her mother but that she had begun to cross-stitch, which helped distract her. Id. At their next meeting, April 20, 2012, Ms. Davis and Plaintiff began to work on a timeline of events that have occurred in Plaintiff's life since August 2007. Id.

At their meetings on May 1 and May 31, 2012, Ms. Davis noted that Plaintiff's depression was moderate. R. at 656. Plaintiff again denied thoughts of suicide. Id. At these meetings and at their next meeting on June 15, 2012, Plaintiff and Ms. Davis discussed Plaintiff's family issues. Id.

At their June 29 and July 11, 2012 meetings, Ms. Davis and Plaintiff discussed Plaintiff's sons and the graduation party that Plaintiff had thrown. R. at 657. On July 25, 2012, Ms. Davis noted that Plaintiff's depression was mild. Id. In their two meetings in August 2012, Ms. Davis noted that at first Plaintiff was avoiding talking about her son going off to college, and how Plaintiff took it very hard when he did leave. Id. However, on September 7, 2012, Ms. Davis noted that Plaintiff's emotional reaction to her son going to college "seems rational." R. at 658. During their meetings on September 19 and October 3, 2012, Ms. Davis noted that Plaintiff continued to adjust to her son being in college. Id. Ms. Davis noted that the rest of October 2012 went "pretty well" for Plaintiff. Id.

In November 2012, Ms. Davis noted that Plaintiff had to deal with the death of her step-daughter, but that she seemed to be "doing okay." R. at 659. During November and December 2012, Ms. Davis reported Plaintiff's depression as "moderate." Id. In January 2013, Plaintiff reported her depression as either a six or seven, and Ms. Davis noted that Plaintiff was dealing with the anxiety of her son having issues at school. Id.

On April 23, 2012, Ms. Davis provided a medical source statement. R. at 472. Ms. Davis found that Plaintiff did not have any "extreme"[7] limitations. Id. Ms. Davis determined that Plaintiff had "marked"[8] limitations in her ability to deal with the public and to deal with stress. Id. Ms.

---

[7] An "extreme" limitation is one where there is "no ability to function in this area. Limitations are present for 76-100% of the time in an 8-hour workday." R. at 472.

[8] A "marked" limitation is one which "effectively preclude[s] from performing the activity in a meaningful manner. Limitations are present for 51-75% of the time in an 8-hour workday." R. at 472.

Davis also determined that Plaintiff had "moderate"[9] limitations in her ability to relate to family and acquaintances, to function independently, and to maintain attention/concentration. Id. Additionally, Ms. Davis found that Plaintiff had moderate limitations in her ability to understand, remember, and carry out complex instructions, and in her ability to behave in an emotionally stable manner. R. at 473. Ms. Davis noted that Plaintiff had "none/mild"[10] limitations in her ability to follow rules, use judgment, and relate to authority figures, as well as none/mild limitations in her ability to understand, remember, and carry out both detailed but not complex instructions and simple instructions. R. at 472. Ms. Davis also noted Plaintiff had none/mild limitations in her ability to maintain her personal appearance and her ability to demonstrate reliability. R. at 473. In the category regarding Plaintiff's ability to "relate predictably in social situations," Ms. Davis recommended that Plaintiff "avoid this." Id. Additionally, Ms. Davis reported that Plaintiff was able to "manage benefits" in her own "best interest." Id. Ms. Davis explained that Plaintiff had "moderate depression [at] all times" and that "she has anxiety that is worsened by being in public." Id.

### 3. Consultative Exams and State Agency Psychological Consultant

On May 29, 2009, the Plaintiff saw Dennis M. Noia, Ph.D., for a psychiatric consultative examination. R. at 313. At this examination, Plaintiff told Dr. Noia that "she is unable to work at the present time because of medical and psychiatric problems." Id. Dr. Noia noted that Plaintiff did

---

[9] A "moderate" limitation means that the person is "significantly limited but not precluded from performing the activity. Limitations are present for 26-50% of the time in an 8-hour workday." R. at 472.

[10] "None/mild" limitations are "absent or minimal limitations. Limitations are present 0-25% of the time in an 8-hour workday." R. at 472.

not report "any significant manic or anxiety related symptoms, or symptoms of a formal thought

disorder or cognitive dysfunction." R. at 314. He noted that Plaintiff reported "occasional

symptoms of depression, including dysphoric moods, crying spells, feelings of guilt, loss of usual

interests, increased irritability, fatigue and loss of energy, problems with memory, problems with

concentration, and diminished sense of pleasure." Id. During this examination, Plaintiff admitted

that pharmacological treatment has improved her symptoms, but that some symptoms still occur. Id.

Dr. Noia reported that Plaintiff's "responsiveness to questions was cooperative" and that her

"manner of relating, social skills, and overall presentation was adequate." Id. Additionally, he

noted that her "personal hygiene and grooming was good." Id. He reported her thought processes to

be "coherent and goal directed" and that her "mood was calm." R. at 315. Dr. Noia diagnosed

Plaintiff with depressive disorder not otherwise specified ("NOS"). R. at 316. He gave the

following medical source statement:

> Vocationally, the claimant appears to be capable of understanding and
> following simple instructions and directions. She appears to be capable
> of performing simple and some complex tasks with supervision and
> independently. She appears to be capable of maintaining attention and
> concentration for tasks. She can regularly attend to a routine and
> maintain a schedule. She appears to be capable of learning new tasks.
> She appears to be capable of making appropriate decisions. She appears
> to be able to relate to and interact moderately well with others. She
> appears to be having occasional difficulty dealing with stress.

R. 315-16. Dr. Noia recommended that Plaintiff continue with her current pharmacological

treatment. R. at 316. He also opined that Plaintiff "appears to be intellectually capable of managing

money, but may need assistance because of medical problems." Id.

    That same day, Plaintiff saw Kaylani Ganesh, M.D., for an internal medicine consultative

examination. R. at 317. Dr. Ganesh diagnosed Plaintiff with depression and found that she had "no

13

gross physical limitation." R. at 319.

On January 25, 2012, Plaintiff saw Christina Caldwell, Psy.D., for a psychiatric consultative evaluation. R. at 437. Dr. Caldwell reported that Plaintiff claimed that she is unable to work due to depression. Id. Dr. Caldwell noted that Plaintiff's "demeanor and responsiveness to questions were cooperative" and that her "manner of relating, social skills, and overall presentation were adequate." R. at 438. Dr. Caldwell noted that Plaintiff's mood was dysthymic and her affect was dysphoric. R. at 439. She determined Plaintiff's recent and remote memory skills to be intact, as well as her attention and concentration. Id. She diagnosed Plaintiff with depressive disorder NOS and panic disorder without agoraphobia. R. at 440. Dr. Caldwell offered the following medical source statement:

> The claimant is able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, and learn new tasks. She is limited in her ability to perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress.

Id.

Additionally, on February 9, 2012, Dr. Butensky, the State's non-examining medical consultant, completed a Psychiatric Review as well as a Mental Residual Functional Capacity ("RFC") Assessment. R. at 443, 457. He determined that Plaintiff had depressive disorder NOS, based on the consultative exam by Dr. Caldwell and on records from Dr. Frederick. R. at 446. He also determined that Plaintiff had panic disorder without agoraphobia based on Dr. Caldwell's consultative exam. R. at 448. He then rated Plaintiff's functional limitations of the "paragraph B" criteria of the listings, and noted that Plaintiff had "mild" restriction of activities of daily living and

14

"moderate" difficulties in maintaining social functioning. R. at 453. Additionally, he noted that Plaintiff had "mild" difficulties in maintaining concentration, persistence, or pace, and had no repeated episodes of deterioration of extended duration. Id. Dr. Butensky also recorded that "evidence does not establish the presence of the 'C' criteria" for affective disorders and anxiety-related disorder. R. at 454.

In the RFC Assessment, Dr. Butensky determined that Plaintiff had some limitations that were moderate but that most of her limitations were not significant. R. at 457-58. He found that Plaintiff was "not significantly limited" in her ability to remember locations and work-like procedures and in her ability to understand and remember, as well as to carry out, very short and simple instructions. R. at 457. He noted that Plaintiff was "moderately limited" in her ability to remember and carry out detailed instructions. Id. Dr. Butensky also determined Plaintiff to be moderately limited in her ability to work in coordination with or proximity to others without being distracted by them. Id. He found that Plaintiff was not significantly limited in her ability to maintain attention and concentration for extended periods and in her ability to sustain in an ordinary routine without special supervision. Id. He also noted that Plaintiff was not significantly limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Id. He found Plaintiff to be not significantly limited in her ability to make simple work-related decisions, in her ability to interact appropriately with the general public, or in her ability to ask simple questions or request assistance. R. at 458. He noted that Plaintiff was moderately limited in her ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of length and rest periods." Id. Additionally, he noted Plaintiff was

moderately limited in her ability to "accept instructions and respond appropriately to criticism from supervisors," as well as in her ability to "set realistic goals or make plans independently of others." Id. He determined Plaintiff was "not significantly limited" in her ability "to get along with coworkers or peers without distracting them or exhibiting behavioral extremes" or in her ability to "maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness." Id. He also ranked Plaintiff's ability "to respond appropriately to changes in the work setting," "to be aware of normal hazards and take appropriate precautions," and "to travel in unfamiliar places or use public transportation" as not significantly limited. Id. Dr. Butensky reviewed the evidence he received from Dr. Caldwell and determined that Plaintiff "has a moderate psychiatric impairment" and that "she retains the capacity to perform simple job tasks." R. at 459.

**B. ALJ Hearing**

Plaintiff testified at a hearing before ALJ Hamel on December 11, 2012. R. at 80. Plaintiff stated that she was a forty-nine year-old woman who attended college for one year. R. at 86. She explained that she has not worked since 1996 and that she lives in a house with her son and her husband. R. at 87. Her husband does not work because he is physically disabled. R. at 88. Plaintiff admitted that she does a load of laundry almost every day and that she tries to cook a meal everyday for supper, but it often is a fast preparation. Id. She also admitted that she uses her computer to check her email. R. at 89. Plaintiff explained that she sweeps the floor of her home occasionally, but most of the time dog hair piles up, and that she has not cleaned her bathroom since she threw her son a graduation party. R. at 98.

Plaintiff has her driver's license but claimed that she does not drive that much, and that she has her husband or son drive her to the doctor if she has an appointment. R. at 90. Plaintiff claimed

16

that she has her husband or son go with her when she goes grocery shopping because she is afraid to run into her mother. R. at 91. Plaintiff explained that her mother gives her anxiety, and that when she sees her mother or deals with things relating to her mother she has panic attacks. R. at 101. She remembered having one panic attack since July 2012. Id,

Plaintiff admitted to taking six different prescription medications, including Cymbalta for depression, oxybutynin for a bladder problem, and nitroglycerin for chest pain, as well as some vitamins. R. at 92. Plaintiff stated that the Cymbalta was helping her depression somewhat, and that her depression improved after her doctor increased her dosage, but she felt as though her emotions still were not completely stabilized. R. at 93. Plaintiff stated that she takes care of herself personally, but not as well as she used to. R. at 94. She admitted that showering is very important to her, and that she likes to take showers. Id.

Plaintiff claimed that she believes that she is unable to work because she doesn't deal well with others, she has trouble concentrating, and she does not feel comfortable without her husband and son being around her. R. at 94-95. She claimed to feel as though she could not be in an environment where there is a possibility that she would see someone who made her feel uncomfortable because she believes that this would cause her to have a panic attack. R. at 95. Plaintiff mentioned that she forgets what she has been asked, and that remembering is a problem for her. Id. She also claimed that she has trouble with making decisions, like what color napkins to buy at the grocery store. R. at 96.

Plaintiff claimed that she does not have any hobbies. Id. She states that she used to take a lot of pictures, but now she only occasionally uses her camera if something is "too neat to resist." Id. Plaintiff mentioned that she likes to watch simplistic television programs because they distract

her from the issues and emotional problems that she has to deal with. R. at 97. Additionally, Plaintiff claimed that her energy level is much lower now than it was before she was depressed. R. at 100.

Plaintiff claimed to have had thoughts of suicide four times over the course of her depression. Id. She claimed that she regularly has "feelings of guiltiness or worthlessness over the fact that [she is] not doing the things that [she] used to do." R. at 100-01.

Plaintiff stated that Dr. Frederick prescribes her medications, and that she sees him every three months. R. at 102. She claimed that she sees Ms. Davis every two weeks for counseling, and has been to counseling since a fire occurred in her home in 2009. R. at 102-03. Before seeing Ms. Davis, Plaintiff stated that she saw Ms. Rice for counseling until Ms. Rice's retirement. R. at 103.

At the ALJ hearing, Gale Franklin, a vocation expert ("VE"), testified. R. at 104. VE Franklin responded to ALJ Hamel's hypothetical about a person in her mid-to-late forties with a high school education and no work background, who can only carry out and focus on routine and repetitive tasks, and who cannot do tasks requiring more than occasional interaction with the public, either in person or by telephone, or more than occasional interactions with coworkers. R. at 105-06. VE Franklin explained that he was able to identify unskilled jobs that this hypothetical person would be able to perform, including a church janitor, a hand packager, and, as a light exertional example, a night office cleaner. R. at 106-07. ALJ Hamel then posed a second hypothetical, in which this same hypothetical person could not do tasks for which there was a strong production pace. R. at 107. VE Franklin testified that this would only eliminate the hand packager as a potential job option from his previous list. Id. VE Franklin also claimed that a job as a gate attendant would meet this criteria, though it possibly would be too superficially interactive. R. at

108.  VE Franklin then gave the job of a surveillance systems monitor as another example of a job which fit this criteria.  R. at 108-09.  ALJ Hamel posed a third hypothetical to VE Franklin, where a person has "trouble focusing effectively on routine tasks in a reliable way meaning the person might be off task a significant portion of the day."  R. at 109.  This hypothetical assumed a person who is off task for about two hours out of an eight hour work day, or in the alternative, someone who is absent from work two or more times in a month.  Id.  Here, VE Franklin claimed there would be no jobs that met this criteria.  Id.

Plaintiff's representative then posed a hypothetical to VE Franklin, asking about a forty-nine year-old person with no past relevant work and a high school diploma who had marked limitations in dealing with the public and in dealing with stress, both limitations existing fifty-one to seventy-five percent of the eight-hour workday.  R. at 111.  Plaintiff's representative explained that this means that this hypothetical person would not be able to handle any stress of competitive employment.  Id.  Plaintiff's representative also added that this person would have moderate limitations in functioning independently present for twenty-six to fifty percent of the eight-hour work day, explaining that during this time the hypothetical person could not stay focused independently on work.  R. at 112.  Additionally, Plaintiff's representative explained that this hypothetical person would have difficulty maintaining attention and concentration on their work for twenty-six to fifty percent of the eight-hour work day.  Id.  VE Franklin responded that, in his opinion, due to the marked limitation in dealing with stress, the hypothetical person could not handle any kind of work.  R. at 113.

Plaintiff's representative then asked another hypothetical: one where a forty-nine year-old individual has no past relevant work history, has a marked limitation in her ability to understand and

remember instructions, and has extreme limitations in the abilities to make simple decisions, manage stress appropriately, and function in a work setting at a consistent pace. R. at 115. Plaintiff's representative explained that, in this example, marked limitations interfere seriously with the "ability to function independently, appropriately, effectively, and on a sustained basis," and are present for at least two-thirds of an eight-hour workday, and that extreme limitations interfere "very seriously with the ability to independently initiate, sustain, or complete activities" and represent "a degree of limitation incompatible with the ability to do any gainful activity." R. at 114-15. VE Franklin stated that there would not be any jobs that this hypothetical individual could do. R. at 115.

In closing remarks of the hearing, Plaintiff's representative stated that, based on the Plaintiff's testimony, she believed that Plaintiff had marked restrictions in activities of daily living, including marked difficulties in maintaining social functions and in maintaining concentration, persistence, or pace. R. at 116. Plaintiff's representative also claimed that, based on Plaintiff's testimony, she believed Plaintiff has a depressive syndrome that meets Listing 12.04. Id.

### C. Procedural History

ALJ Hamel issued an unfavorable decision on December 19, 2012, finding that Plaintiff had not engaged in any substantial gainful activity since her application date on October 27, 2011. R. at 46. While the ALJ found that Plaintiff had a severe impairment, namely, major depressive disorder, he found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. R. at 47. The ALJ also considered Plaintiff's obstructive sleep apnea and gastroesophageal reflux disorder, and found that these impairments were not severe, as there was no

evidence showing that these conditions caused any functional loss.[11]  R. at 46.

While considering whether the severity of Plaintiff's mental impairment met or medically equaled the criteria of listing 12.04, ALJ Hamel considered whether the "paragraph B" criteria was satisfied.  R. at 47.  He determined that the paragraph B criteria were not met.  Id.  The ALJ found that Plaintiff had only mild restrictions in daily living.  Id.  He determined that Plaintiff had moderate difficulties in social functioning and in maintaining concentration, persistence, or pace. Id.  Additionally, the ALJ found that Plaintiff experienced no extended episodes of decompensation. Id.

The ALJ then considered whether the "paragraph C" criteria of 12.04 had been met.  Id.  The ALJ found that Plaintiff did not meet these criteria.  R. at 48.

The ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels, with the non-exertional limitations of routine and repetitive tasks, and limited to only occasional public interaction and only occasional interaction with coworkers.  Id.  The ALJ concluded that the transferability of job skills was not an issue as the claimant does not have any past relevant work.  R. at 51.  After considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  Id.  Therefore, ALJ Hamel concluded that Plaintiff was not disabled as defined in the Social Security Act.  R. at 52.

Plaintiff filed a request for review of the ALJ's decision on January 30, 2013.  R. at 40. The Appeals Council denied Plaintiff's request for review on March 28, 2014, and the ALJ's decision

---

[11] Plaintiff's sleep apnea is treated with a CPAP machine, and her gastroesophageal reflux disorder is treated through medication prescribed by Dr. Frederick.  R. at 46.

became the final decision of the Commissioner.  R. at 1.  Plaintiff filed an appeal on May 9, 2014.

Dkt. No. 1 ("Complaint").

## III.    LEGAL STANDARD

### A.  Standard of Review

When the Court reviews the SSA's final decision, it determines whether the ALJ applied the

correct legal standards and if his decision is supported by substantial evidence in the record.  42

U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)).  Substantial evidence amounts to "more than

a mere scintilla," and it must reasonably support the decision maker's conclusion.  Halloran v.

Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

The Court defers to the Commissioner's decision if it is supported by substantial evidence, "even if

it might justifiably have reached a different result upon a de novo review."  Sixberry v. Colvin, No.

12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of

Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).  "The substantial evidence standard

means once an ALJ finds facts, we can reject those facts 'only if a reasonable factfinder would *have*

*to conclude otherwise.*'"  Brault v. Social Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012)

(quoting Warren v. Shalala, 29 F.3d 1287, 1290 (8th Cir. 1994)).  The Second Circuit has affirmed

the Commissioner's decision to deny benefits even when there was substantial evidence in the

record that the Claimant is disabled.  See DeChirico v. Callahan, 134 F.3d 1177, 1182 (2d Cir.

1998)  (finding that while there was substantial evidence in the record to support a finding that

DeChirico was disabled per se, there was "also substantial evidence in record from which the ALJ

could have reasonably concluded" otherwise).  However, the Court should not uphold the ALJ's

decision when it is supported by substantial evidence but it is not clear that the ALJ applied the correct legal standards.  Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

**B. Standard for Benefits**

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).  An individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health & Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)).

In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process.  20 C.F.R. § 404.1520(a)(1).  In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA.  Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). The five-step analysis used by the SSA is sequential, meaning that the determination at each step dictates whether the analysis proceeds to the subsequent step.  Gennardo v. Astrue, 333 F. App'x 609, 610 (2d Cir. 2009).  If the SSA is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends.  20 C.F.R. § 404.1520(a)(4).  Otherwise, the SSA will proceed with the analysis.  Id.

At step one, the SSA considers whether the claimant's current work is "substantial gainful activity."  Id. § 404.1520(a)(4)(i).  If it is, the claimant is not disabled under the SSA standards.  Id. At step two, the SSA considers whether the claimant has a severe medically determinable physical

or mental impairment, or combination of impairments that is severe, that meets the duration

requirement in 20 C.F.R. § 404.1509.  Id. § 404.1520(a)(4)(ii).  If she does not have such an

impairment, the claimant is not disabled under the SSA standards.  Id.  At step three, the SSA

considers the severity of the claimant's medically determinable physical or mental impairment(s) to

see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. Pt. 404, App. I.

Id. § 404.1520(a)(4)(iii).  For Affective Disorders (Listing 12.04), "[t]he required level of severity

for these disorders is met when the requirements in both A and B are satisfied, or when the

requirements in C are satisfied."  Id. Pt. 404(P), App. I.  To satisfy the "paragraph B" criteria of 20

C.F.R. Part 404, Subpart P, Appendix I, the mental impairment must result in at least two of the

following: marked restriction of activities of daily living; marked difficulties in maintaining social

functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated

episodes of decompensation, each of extended duration.  Id.  To satisfy the "paragraph C" criteria of

12.04, the record must contain:

> Medically documented history of chronic affective disorder of at least 2
> years' duration that has caused more than a minimal limitation of ability
> to do basic work activities, with symptoms or signs currently attenuated
> by medication or psychosocial support, and one of the following: 1)
> Repeated episodes of decompensation; or 2) A residual disease process
> that has resulted in such marginal adjustment that even a minimal
> increase in mental demands or change in the environment would be
> predicted to cause the individual to decompensate; or 3) Current history
> of 1 or more years' inability to function outside a highly supportive
> living arrangement, with an indication of continued need for such an
> arrangement.

Id.  If the severity of the claimant's medically determinable physical or mental impairment(s) does

not meet or equal an impairment and the requisite duration listed in 20 C.F.R. Pt. 404(P), App. I, the

SSA continues to step four to review the claimant's RFC and past relevant work.  Id.

§ 404.1520(a)(4)(iv).  The claimant is not disabled under the SSA standards if the RFC reveals that

the claimant can perform past relevant work.  Id.  If the claimant cannot perform her past relevant

work, the SSA decides at step five whether adjustments can be made to allow the claimant to work

somewhere in a different capacity.  Id. § 404.1520(a)(4)(v).  If appropriate work does not exist, then

the SSA considers the claimant to be disabled.  Id.

## IV.    DISCUSSION

Plaintiff claims that the Commissioner's final decision "lacks even a 'mere scintilla' of

evidentiary support" and is based upon "patent error."  Pl.'s Br. at 15.  Plaintiff argues that the ALJ

improperly evaluated the medical evidence in accordance with the requirements of 20 C.F.R.

§ 416.927 and that the ALJ improperly evaluated Plaintiff's credibility.  Pl.'s Br. at 15-24.

### A. Medical Evidence

Plaintiff argues that ALJ Hamel incorrectly weighed the medical opinions of Dr. Frederick,

Ms. Davis, Dr. Noia, Dr. Caldwell, and Dr. Butensky.  Id. at 18-23.  First, Plaintiff argues that the

ALJ should have afforded controlling weight to Dr. Frederick's medical opinion under the treating

physician rule.  Id. at 18.  Plaintiff also argues that ALJ Hamel mischaracterized the mental health

treatment given by Dr. Frederick to Plaintiff.  Id. at 19.  Next, Plaintiff argues that ALJ Hamel

"erroneously afforded 'limited weight' to the opinion of Ms. Davis."  Id.  Plaintiff claims that the

ALJ failed to consider the entirety of the record and "cherry picked" from Ms. Davis's treatment

notes.  Id. at 22.  Additionally, Plaintiff argues that the ALJ erred "in affording great weight to the

consultative examiners, Dr. Noia and Dr. Caldwell," as well as in placing "great weight on the

State's non-examining medical consultant."  Id. at 22-23.

*1. Dr. Frederick*

A treating source's opinion is given controlling weight when his or her opinion "on the issue(s) of the nature and severity of [a plaintiff's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). "The opinion of the treating physician is not afforded controlling weight where the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Young v. Astrue, No. 05-CV-1027, 2008 WL 4518992, at *8 (N.D.N.Y. Sept. 30, 2008).

Here, ALJ Hamel did not err in determining that Dr. Frederick's opinion does not warrant controlling weight under the treating physician rule, as his opinion was inconsistent with "other substantial evidence" in Plaintiff's case record, namely the consultative exams done by Dr. Noia, Dr. Caldwell, and Dr. Butensky. See R. at 50, 313, 437, 443; see also Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) (holding that the report of a consultative physician may constitute substantial evidence). Additionally, it cannot be said that the ALJ erred in his consideration of the conflicting medical evidence in the record, because courts will defer to the "Commissioner's resolution of conflicting evidence." See Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).

Moreover, because the "ultimate finding of whether a claimant is disabled and cannot work" is reserved to the Commissioner, it is the ALJ's job to "consider[] the data that physicians provide" but to draw his own conclusion as to whether those data indicate disability. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). "A treating physician's statement that the claimant is disabled cannot itself be determinative." Id. "When an ALJ refuses to assign a treating physician's opinion controlling

26

weight, he must consider a number of factors to determine the appropriate weight to assign." <u>Young</u>, 2008 WL 4518992, at *7. These factors include: the examining relationship, the treatment relationship (including the length of the treatment and the frequency of examination, as well as the nature and extent of the treatment relationship), supportability, consistency, specialization, and other factors brought to their attention that support or contradict the opinion. 20 C.F.R. § 416.927(c).

ALJ Hamel concluded that "limited weight" should be afforded to Dr. Frederick's opinions because he determined that there was a lack of consistency between Dr. Frederick's medical opinions and Plaintiff's own description of her daily activities at the hearing. R. at 50. ALJ Hamel noted that Plaintiff portrayed herself to be limited in her daily activities; however, she admitted that she got her children on the bus in the morning, did a load of laundry daily, cooked dinner, and used a computer for email. R. at 49. ALJ Hamel also gave "limited weight" to Dr. Frederick's opinions because he determined that he saw Plaintiff mostly for physical impairments, like for fatigue due to her diagnosis of cytomegalovirus, for her gastroesophageal reflux disorder, and for medication management. R. at 50, 355, 394. In Plaintiff's medical records, when Dr. Frederick noted giving Plaintiff a "psych exam," his report included factors such as whether Plaintiff was alert and cooperative, her mood and affect, her attention span and concentration, and whether she was laughed or smiled. R. at 338, 354, 372. In determining how to weigh Dr. Frederick's opinion, ALJ Hamel considered the fact that Dr. Frederick specializes in family medicine, not psychiatry, whereas Drs. Noia, Caldwell, and Butensky all specialize in psychology. R. at 50, 313, 437, 443. Here, specialization weighs in favor of the opinions of Drs. Noia, Caldwell, and Butensky, because generally more weight is given "to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 416.927(c).

While the ALJ noted that Plaintiff had a significant treatment relationship with Dr. Frederick, treatment relationship is only one factor an ALJ must consider when he determines what weight to give to medical opinions.  R. at 50; 20 C.F.R. § 416.927(c)(2).  In considering Dr. Frederick's lack of specialization in mental impairments and the inconsistencies in the record, the ALJ adequately explained why he did not give Dr. Frederick's opinion controlling weight.  R. at 50; see 20 C.F.R. § 416.927(c).

Plaintiff argues that ALJ Hamel erroneously characterized the mental health treatment Plaintiff received from Dr. Frederick as "sporadic."  Pl.'s Br. at 19.  However, many of Plaintiff's visits with Dr. Frederick were scheduled as routine follow-up appointments, appointments for her gastroesophogeal reflux disorder, and appointments regarding her fatigue due to cytomegalovirus.  R. at 355, 383, 394, 396, 401, 405.  Additionally, at Plaintiff's visits to Dr. Frederick, he did not always record giving Plaintiff a "psych exam."  R. at 554, 559, 573, 582, 586, 591.  Therefore, ALJ Hamel did not err in affording Dr. Frederick's opinion limited weight.  See 20 C.F.R. § 416.927

### 2. Ms. Davis

Plaintiff also argues that the ALJ erroneously afforded "limited weight" to the opinion of Ms. Davis.  Pl.'s Br. at 19.  Plaintiff correctly states that "the ALJ may not outright dismiss" the medical opinion of Ms. Davis because he determined that she is not classified as a "medically acceptable source."  Id.  However, ALJ Hamel did not outright dismiss Ms. Davis's opinion, as he did afford it limited weight.  R. at 50.  The ALJ explained that he was affording "limited weight" to Ms. Davis because she was not a medically acceptable source and because her opinion seemed to be inconsistent with her own treatment notes.  Id.  Federal regulations omit licenced clinical social workers from the list of acceptable medical sources, so there is no requirement that the ALJ treat

Ms. Davis, a licensed clinical social worker, as an acceptable medical source. See 20 C.F.R. § 416.913. Therefore, ALJ Hamel did not err in determining that Ms. Davis was not an acceptable medical source. See id.

Additionally, while "other sources" are still able to submit evidence to show the severity of Plaintiff's impairment and her ability to do work, opinions from "'other sources' cannot establish the existence of a medically determinable impairment." SSR 06-3p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Furthermore, "only 'acceptable medical sources' can be considered treating sources." Id. In considering opinion evidence from other sources, like that of a licensed clinical social worker, an ALJ should consider factors such as "[h]ow long the source has known and how frequently the source has seen the individual; [h]ow consistent the opinion is with other evidence; [t]he degree to which the source presents relevant evidence to support an opinion; [h]ow well the source explains the opinion; [w]hether the source has a specialty or area of expertise related to the individual's impairment(s); and [a]ny other factors that tend to support or refute the opinion." Id. at *4-5. ALJ Hamel noted that Ms. Davis's opinion regarding Plaintiff's limitations was inconsistent with her own notes, which indicated Plaintiff's progress with treatments and with weather changes. R. at 50; see also R. at 466-68. In this regard, the ALJ considered the supportability and consistency of Ms. Davis's opinion. 20 C.F.R. § 416.927(c). Plaintiff cites Selinsky v. Comm'r of Soc. Sec., No. 08-CV-1363, 2010 WL 2671502 (N.D.N.Y. June 14, 2010), in support of her argument that the ALJ erred in his determination of what weight to give Ms. Davis's opinion. Pl.'s Br. at 19-20. The ALJ in Selinsky erred by failing to give a nurse practitioner's opinion proper consideration, as he rejected her opinion "out of hand and without any further exploration into the basis for her assessment and/or whether it was consistent with the other evidence of record." 2010 WL 2671502 at *4. Here, ALJ

29

Hamel did not completely reject Ms. Davis's opinion, as he gave it limited weight after considering both her opinion and her treatment notes and found her opinion to be inconsistent with other evidence in the record.  Id.; R. at 50.

Plaintiff also argues that the ALJ failed to consider the entirety of Ms. Davis's treatment notes.  Pl.'s Br. at 22.  However, the Second Circuit has held that where "the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability."  Mongeur, 722 F.3d at 1040; see also Matta v. Astrue, 508 F. App'x. 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").  Additionally, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."  Brault, 683 F.3d at 448 (quoting Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)).  Furthermore, a court will not remand when it is "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence."  Mongeur, 722 F.3d at 1040 (quoting Berry, 675 F.2d at 469); see also Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981) ("[W]e are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony . . . .").

### 3.  Consultative Examiners

Additionally, Plaintiff argues that the ALJ erred in affording "great weight" to the consultative examiners, Dr. Noia and Dr. Caldwell.  Pl.'s Br. at 22.  ALJ Hamel stated that he was giving "great weight" to Dr. Noia and Dr. Caldwell, even though they were one-time examiners,

because their opinions were consistent with Plaintiff's mental health treatment and her response to that treatment. R. at 50. The consultative examiners both diagnosed Plaintiff with depression but noted that Plaintiff had lesser functional limitations than those identified by Dr. Frederick. Id. Again, while the ALJ noted that Dr. Noia and Dr. Caldwell only examined Plaintiff once, therefore having no significant treatment relationship with Plaintiff, he found that their opinions were supported by and consistent with Plaintiff's medical records and that they both specialized in the field of psychology, factors which weighed in favor of affording their opinions great weight. Id.; see also 20 C.F.R. § 416.927(c).

Plaintiff also argues that the ALJ erroneously gave "great weight" to the State's non-examining medical consultant. Pl.'s Br. at 23. ALJ Hamel gave great weight to Dr. Butensky's opinion, despite it being from a non-examining source, because he found it to be consistent with both Plaintiff's own allegations and the consultative examinations done by Dr. Noia and Dr. Caldwell. R. at 50. Accordingly, Dr. Butensky's opinion is consistent with and supported by substantial evidence in the record. See 20 C.F.R. § 416.927(c). Additionally, Dr. Butensky specializes in the field of psychology. R. at 443; see also 20 C.F.R. § 416.927(c). While Dr. Butensky never examined Plaintiff, "[t]he fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because . . . 'acceptable medical sources' 'are the most qualified health care professionals.'" SSR 06-3p, 2006 WL 2329939, at *5.

### B. Credibility Determination

"The ALJ retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and 'to arrive at an independent judgment, in light of medical findings and other

evidence, regarding the true extent of the pain alleged by the claimant.'" Young, 2008 WL

4518992, at *11 (quoting Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)). "A reviewing

court's role is merely to determine whether substantial evidence supports the ALJ's decision to

discount a claimant's subjective complaints." Id.; see also Aponte v. Sec'y, Dep't of Health and

Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (holding that an ALJ's determination of credibility

of a claimant is entitled to deference if it is supported by substantial evidence).

Here, ALJ Hamel determined that Plaintiff's statements concerning the intensity,

persistence, and limiting effects of her symptoms were not credible. R. at 49. He found that

Plaintiff appeared to exaggerate her condition. Id. Plaintiff argues that ALJ Hamel "erroneously

determined that [Plaintiff's] symptoms and alleged limitations were 'out of proportion to the mental

status examination findings showing some situational stressors but an overall improvement in mood

with treatment.'" Pl.'s Br. at 24 (quoting R. at 49). Plaintiff correctly noted the factors which an

ALJ will consider "if plaintiff's testimony concerning the intensity, persistence or functional

limitations associated with her pain is not fully supported by clinical evidence." Young, 2008 WL

4518992, at *10. These factors relevant to a claimant's symptoms include:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relive pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

> 7. Any other factors concerning the individuals functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, 2016 WL 1119029, at *7 (Mar. 16, 2016); see also SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996); 20 C.F.R. § 416.929(c)(3).

In determining Plaintiff's credibility, ALJ Hamel did consider these factors, as he considered evidence in the record regarding Plaintiff's daily activities, aggravating factors, and medication. R. at 49. ALJ Hamel determined that Plaintiff is not as limited in her activities as she claimed to be, as he noted that Plaintiff reported completing daily activities, such as doing laundry, checking her email, and cooking dinner. Id.; see also 20 C.F.R. § 416.929(c)(3)(i). Plaintiff argues that the ALJ improperly characterized Plaintiff's daily activities. Pl.'s Br. at 24. However, ALJ Hamel never stated that Plaintiff had an extensive capacity to perform a full range of daily activities, only stating that she is "able to do cooking and other housework, she uses a computer for email, and she has her driver's license." R. at 49. ALJ Hamel considered the factors that aggravate Plaintiff's depression, like bad weather, the fire in her home, and seeing her mother. 20 C.F.R. § 416.929(c)(3)(iii). Additionally, ALJ Hamel noted that Plaintiff admitted the improvement of her symptoms with medication. R. at 576; see also 20 C.F.R. § 416.929(c)(3)(iv). The ALJ also noted that "there is nothing in the treatment records to suggest that the medication has not been helpful in alleviating symptoms or that it has caused side-effects that reduce her ability to work beyond the limitations noted in the residual functional capacity assessment." R. at 50.

Plaintiff cites Balsamo v. Chater, 142 F.3d 75 (2d Cir. 1998), in support of her argument that the fact that Plaintiff "still tries to contribute to the care of her family by occasionally performing chores around the house or cooking a separate meal should not be used to discredit her." Pl.'s Br. at

25.  However, this case is distinguishable from <u>Balsamo</u> because the ALJ in <u>Balsamo</u> substituted his own judgment for that of a medical opinion in determining that the claimant was not disabled. <u>Balsamo</u>, 142 F.3d at 81.  Whereas, here ALJ Hamel did not substitute his own judgment for that of a medical opinion; he considered the whole record and compared Plaintiff's statements "in connection with [her] claim for disability benefits with any existing statements [she] made under other circumstances," SSR 16-3p, 2016 WL 1119029, at *8, and found that Plaintiff's statements were not entirely credible because of her limited portrayal of her daily activities and that she admitted to improvements of her symptoms with medication.  Therefore, because "[i]t is the function of the Secretary, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant," <u>Aponte</u>, 728 F.2d at 591 (alteration in original) (quoting <u>Carroll v. Secretary of Health and Human Servs.</u>, 705 F.2d 638, 642 (2d Cir. 1982)), ALJ Hamel did not err in considering Plaintiff's statements regarding these factors when evaluating her credibility.

Lack of consistency can undermine Plaintiff's credibility, and in reviewing the Plaintiff's allegations, the ALJ must "compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record."  SSR 96-7p, 1996 WL 374186, at *5; see also SSR 16-3p, 2016 WL 1119029, at *8.  During the ALJ hearing, Plaintiff reported having multiple suicidal ideations. R. at. 100.  However, she never reported them to Dr. Frederick, to her counselors, or during her consultative exams.  R. at 49.  In fact, she denied having suicidal thoughts multiple times during her counseling sessions with Ms. Davis, claiming that it was something she would never do.  R. at 465. Additionally, ALJ Hamel noted that while Plaintiff explained the stressors that trigger her panic

attacks during the hearing, she admitted that she only had one panic attack since July 2012. R. at 49-50. Futhermore, because "SSA regulations provide that the fact-finder 'will consider all of the evidence presented, including information about your prior work record,'" the ALJ properly noted Plaintiff's lack of significant work history, even before her disability began, when he determined her credibility. See Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998) (quoting 20 C.F.R. § 416.929(c)(3)).

"When rejecting subjective complaints of pain, an ALJ must do so 'explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief[.]'" Young, 2008 WL 4518992, at *10 (quoting Brandon v. Bowen, 666 F.Supp. 604, 608 (S.D.N.Y. 1987)). Here, ALJ Hamel considered Plaintiff's conflicting statements regarding her thoughts of suicide and her portrayal of limitations in her daily abilities in combination with Plaintiff's lack of relevant past work history. R. at 49. Taking into account these factors, there is a legitimate reason for the ALJ's disbelief and ALJ Hamel supplies "sufficient specificity" for the Court to find this. See Brandon, 666 F.Supp. at 608. Therefore, ALJ Hamel's credibility determination was supported by substantial evidence.

V.      **CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

DATED:     June 23, 2016
              Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge